Argued April 18, affirmed June 30, objections to cost bill sustained
September 12, 1950

# BERRY *v.* RICHFIELD OIL CORPORATION ET AL.

220 P. (2d) 106
222 P. (2d) 224

*Forrest E. Cooper,* of Lakeview, argued the cause and filed a brief for appellant.

*Herbert P. Welch,* of Lakeview, argued the cause for respondents. With him on the brief was David T. Guntert, of Los Angeles.

Before Lusk, Chief Justice, and Belt, Rossman, Bailey and Latourette, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a decree of the Circuit Court in favor of the defendants-respondents which dismissed the suit. The respondents are Richfield Oil Corporation, Shelby Bailey and Eldon Young. We may hereafter refer to the oil company as Richfield.

This suit arose out of a ten-year lease which was signed by the appellant, as lessor, December 30, 1940, and by Richfield, as lessee, January 8, 1941. The lease bound the appellant to erect a combination service station and grocery store upon a site owned by her in Lakeview. The structure was completed March 29, 1941. The lease describes the entire property, and Richfield has possession of both the store and the service station. Both parts are under the same roof. It is the contention of the appellant that the respondents, Bailey and Richfield, through false representations that Richfield would exercise dominion over the service station part only and permit her to have the store section, induced her to sign the lease. Since we shall have frequent occasion to mention the grocery store part, we explain that its size is modest; its greatest length is 28 feet and its widest part is 24 feet. The portion of the structure occupied by the service station, with its pumps, car hoist, service room and incidental appointments, is much larger than that given over to the store.

The lease bound Richfield to pay the appellant a rental of 1½ cents for each gallon of gasoline delivered to the station. It provided that the monthly rental should never be less than $45.00.

We stated that the lease describes the entire prop-

erty. That instrument, referring to the appellant as the lessor and to Richfield as the lessee, says:

> "Lessor, for and in consideration of * * * has demised and leased and by these presents does hereby demise and lease unto Lessee that certain real estate situated in the city of Lakeview, County of Lake, State of Oregon, particularly described as follows, to-wit:"

At that point occurs a description of the premises. Going on, the lease says:

> " * * * also with an easement for Lessee, its customers, employes, invitees and sub-lessees and their automotive and other motor vehicle equipment over and across the following parcel of land * * *. Such easement to be used for purposes of ingress and egress to and from the oil and gasoline service station situated upon the above-described property."

The instrument does not use the word "grocery store", but Article IV says:

> "Lessor covenants and agrees with Lessee that as part of the consideration for the rental herein * * * it will cause forthwith at its expense to be constructed and installed upon the leased real estate, for the use and benefit of Lessee, an oil and gasoline service station complete with buildings, driveways * * * and facilities and such other improvements and equipment as may be required by the plans and specifications therefor to be furnished or approved by Lessee. * * * At the time of completion of the construction and installation of all buildings, improvements and equipment to be constructed and installed hereunder by Lessor, an inventory thereof marked Exhibit 'A' shall be hereto attached and become a part hereof."

As we shall presently see, the plans and specifications which were prepared under the appellant's direction,

and which were approved by Richfield, included the store space. The inventory required by the clause last quoted was prepared and signed by the parties when the building was completed. It contains this phrase, "service station and store building." It concludes with this provision:

> "It is understood and agreed that the foregoing constitutes all the buildings, improvements and equipment to be furnished by Lessor under the terms of the lease of which this exhibit is a part."

After the complaint makes it charges of fraud, its prayer asks that the lease be cancelled, that Bailey and Richfield be required to account for the income they derived from the grocery store, that the plaintiff be awarded punitive damages in the amount of $25,000, and that the court quiet the title of plaintiff to the property.

Respondent Bailey held a position with Richfield which the witnesses entitled commission agent. He had charge of its bulk plant in Lakeview; a layman might recognize his position as that of a wholesaler of Richfield gasoline. He received a commission upon all gasoline which he sold to stations. His uncontradicted testimony shows that he had no authority to bind Richfield in any matter. His interest in the lease transaction was due to the fact that additional stations augmented his sales of gasoline. Concerning the negotiations for the lease, he termed himself "a bystander." The respondent, Young, on March 1, 1946, became the sublessee of the service station. He is not accused of any wrongdoing.

The answer denied all averments of fraud. After the trial in the Circuit Court, which resulted in a transcript of evidence covering 403 pages and accom-

panied with numerous exhibits, the aforementioned decree was entered. The entry of the decree was preceded by a memorandum opinion, from which we quote:

"It is apparent that at the time of the execution of the agreement, the parties thought the gallonage due plaintiff under the agreement would be a substantial amount, and in my estimation, this, in part, accounts for the fact that plaintiff entered into an agreement whereby she permitted the store room to be included in the lease."

That, of course, is a holding that the appellant, as lessor, intended that Richfield should have the store room as well as the service station. The memorandum opinion continues:

"The agreement was not readily entered into. The plaintiff was represented by competent counsel, and she was aware of all the terms of the lease, * * *. Perhaps due to the War, Bessie Barry made an unsatisfactory lease agreement with the Richfield Oil Corporation, but I feel that she was at all stages of the transaction represented by competent counsel and was fully aware of what she was doing and should not be permitted at this late date to come into Court and ask to have the lease cancelled and seek * * *."

It will be observed that the trial judge declared that the suit was filed at a late date. The suit was not filed until February 25, 1947, approximately six years after the lease became effective.

The appellant presents three assignments of error. They are:

"The Court erred in not viewing with distrust all of the evidence offered by the defendants because they elected to stand upon verbal statements and to withhold from the Court the complete written memo of witness Galloway covering the pro-

posed lease between plaintiff and defendant Richfield.''

''The Court erred in not finding that the plaintiff was induced, by means of fraudulent representations, to execute the contested lease with defendant Richfield.''

''The Court erred in not finding that the inadequacy of the consideration constituted evidence of fraud.''

As we have said, this suit is based upon a charge of fraud made against respondents Richfield and Bailey. The mention of some additional facts will facilitate an understanding of the charge of fraud. The plaintiff owns an auto court in Lakeview. Constituting a part of the grounds is the site of the building which contains the filling station and store. Prior to the construction of the building, which took place in the early part of 1941, a smaller structure occupied the site. It, too, was a combination service station and grocery store. One Lytton Plato, as tenant of the appellant, operated it. It had a single pump and sold Richfield gasoline. In October, 1940, the appellant desired to replace the old building with a new one, provided Richfield displayed an interest. As a result of the inquiries she made, respondent Bailey acquainted Richfield with her wishes and thereupon it had Mr. L. L. Galloway, of Klamath Falls, territory salesman for Richfield, call upon the appellant. When Mr. Galloway learned that the appellant desired to include in the new structure space for a grocery store, he declared that Richfield was not interested. He explained that his employer did not care to lease any building which included a grocery store. However, respondent Bailey was favorable to the proposal and so stated to Galloway. Bailey thought that since the

new structure would be a part of the appellant's auto court the store would contribute patronage to the service station. Presently Galloway adopted that point of view and agreed to submit the appellant's proposal to his superiors. Then Galloway and a friend of the appellant by the name of Arthur Plato stepped off the site of the contemplated structure and were told by a contractor by the name of D. H. Lewis, whom the appellant had summoned, that the structure could be built for about $5,000.

Galloway had no authority to commit Richfield to any course, but, due to the fact that he had been won over to the appellant's proposal, she requested Mr. Lewis at the close of the visit to prepare plans and specifications for the contemplated building. Upon completion of those papers, Lewis estimated that the improvement would cost $4,200. His plans and specifications were later approved by Richfield, and January 1, 1941, the appellant awarded him a contract to build the structure. The plans include the store space.

The appellant lacked the money needed to build the structure. She deemed her auto court worth $15,000, but it was encumbered with a mortgage for $6,000 and she owed a local bank $100. At that juncture Galloway told her that the Equitable Savings & Loan Association of Portland might be willing to help her. Upon application to that concern she found it would be willing to lend her $4,200 for building purposes if (1) Richfield would lease the premises for ten years at a minimum monthly rental of $45; (2) she would obtain a release of the building site from the mortgage; (3) pledge the ten-year lease as security for payment of the debt; and (4) execute to Equitable a mortgage covering the site and new building.

After the appellant gained the information just described she had her attorney, Theodore R. Conn, of Lakeview, draft a letter addressed to the Portland office of Richfield, from which we quote:

"Your agent has made the offer that if I will cause to be erected at my own expense a service station in accordance with plans to be submitted, that the Richfield Oil Corporation will rent said premises for a period of 10 years at a monthly rental of $45.00 per month, with an additional 1½¢ per gallon for all gasoline sold and delivered by the Richfield Oil Corporation to said service station in the excess of 4500 gallons per month.

"This offer is acceptable to me, providing that the terms of your lease meet with the approval of myself and my counsel at the time it is submtited, and if the plans and specifications are also agreeable to me. * * * "

Richfield found the appellant's proposal acceptable, and December 10, 1940, prepared the necessary lease. December 30, Mr. Galloway brought it to Lakeview for the appellant's consideration. We shall later mention the help which the appellant secured in understanding the instrument before she signed it. As previously mentioned, she executed the instrument December 30, 1940. January 1, 1941, Mr. Lewis started construction of the new building. March 29, 1941, the building was completed and the lease became effective. February 25, 1947, this suit was instituted. The following is the charge of fraud made in the complaint:

" * * * defendant Richfield Oil Corporation, and the said defendant Shelby Bailey, then and there falsely represented unto plaintiff that for the purpose of obtaining such financial assistance from said Equitable Savings & Loan Association that it would be necessary for the lease in favor of defendant Richfield Oil Corporation, the rent

from which was to be assigned to said lending institution, to extend to the four corners of the tract of land to be agreed upon but that defendant Richfield Oil Corporation and defendant Bailey were not interested in any store, did not want the store space, were solely interested in the oil business and that the store half of said structure should continue to be the exclusive property of the plaintiff with the right to occupy or rent the same, as was the case with the structure then in place, said lease to cover the entire duplex building for the sole purpose of going through the formality of satisfying said Equitable Savings & Loan Association which would likewise have to approve the plans and specifications. That the plaintiff, in reliance upon the representations then and there made to her by defendant Richfield Oil Corporation and defendant Shelby Bailey, not knowing said representation that plaintiff was to be entitled to the grocery store portion of said duplex building for the ten years lease period was false and fraudulent, not knowing that it was being falsely made for the sole purpose of inducing plaintiff to sign a lease in their favor covering the entire premises for their sole benefit as hereinafter alleged, and not realizing that she was being tricked into signing a lease hereinafter referred to for the purpose of enabling the defendants Richfield Oil Corporation and Shelby Bailey to cheat and defraud her in the manner hereinafter set forth, then and there mutually agreed with the defendants Richfield Oil Corporation and Bailey to''

(1) obtain a release of the existing mortgage from its application to the building site; (2) borrow $4,200 from the Equitable Savings & Loan Association; (3) secure repayment in part of the loan by assigning to the mortgagee the contemplated lease; (4) construct the building; and (5) sign a lease

''containing the legal description of the entire tract

set aside and dedicated to said improvement, in reliance upon the fraudulent representation of said defendants Richfield Oil Corporation and Shelby Bailey that a lease instrument covering the entire structure was a mere formality to satisfy said Equitable Savings & Loan Association, and was to be of no use, value or benefit to defendant Richfield Oil Corporation or to its agents or to defendant Shelby Bailey beyond the scope of said service station for that portion of said structure and premises."

As we have said, all charges of fraud are denied. We read with painstaking care the entire record and examined with equal care all of the exhibits. We shall now narrate the circumstances attendant upon the signing of the lease. That instrument is five pages in length. Its major part is in print. Its format facilitates a reading and understanding of the instrument.

We know nothing about the plaintiff's age, but we observe that she personally operated her auto court, which consisted of 17 cabins. The prudent manner in which she made entries upon her check stubs shows that she has familiarity with business practices. In consummating this lease she was assisted by the aforementioned Arthur Plato. Mr. Plato was 63 years of age and said that he had had business experience extending over 40 years. He is the father of Lytton Plato whom we have mentioned.

It will be recalled that the appellant claims that she was induced to sign the lease which described the entire property under representations that Richfield would permit her to have the store. In the early stages of the negotiations before the lease was drafted she told Mr. Galloway, so the appellant swore,

"I wouldn't build this building without the store,

and it would have to be a duplex, under one roof, and they told me the description of the property would have to go in to Equitable for the mortgage, and then the Richfield lease had to have the same description.''

Referring to Galloway and the day when he presented the lease for her perusal, she testified:

''He told me the company had accepted the proposition as we have been talking, and that they would take the ten-year lease on the service station, and I would have the store, and the store was not mentioned in the lease because they had to have the description of the lease to back up the mortgage, and Lytton was to have the station and I was to have the store. The store was to be mine.''

At that point there occurred some colloquy between the trial judge and counsel, at the close of which the appellant continued:

''Mr. Galloway said the description of the property had to go in the lease the same as it was in the mortgage. The store was not mentioned in the mortgage, but it was mine.

''Q. Did he say anything else?
''A. That they would take a ten-year lease on the service station, and Lytton was to go in the service station and the store was to be mine.

''Q. Did he say anything else?
''A. He said between Richfield and I it didn't make any difference. So far as Richfield and I was concerned, it didn't make any difference. He meant the store would be mine, as it was described. Richfield was to have the station and I was to have the store.''

The appellant left unmentioned the fact that before she signed the lease she had her attorney, Mr. Theodore Conn, analyze it for her. Since she did not divulge

that fact, she, of course, also left unmentioned whether or not she inquired of Mr. Conn concerning the validity of an unwritten agreement to exempt part of the premises from a written lease which covered the entire premises.

Not one word of the appellant's testimony imputes to Bailey the utterance of even a single deceitful syllable, yet her complaint accuses him of fraud and demands the assessment of punitive damages against him in the sum of $25,000.

We said that before the appellant signed the lease she took it to her attorney, Mr. Theodore Conn, and had him analyze it for her. Those facts are established, not only by the uncontradicted testimony of Mr. Conn, who was called to the witness stand by the respondents, but also by Arthur Plato, who testified in behalf of the appellant. We pause in our review of the appellant's testimony to take note of what Mr. Plato said upon that subject. That witness, referring to the meeting which was held in the appellant's office when Galloway brought the lease, testified:

"We all read it over, and Miss Berry after she had read it over said, 'I don't see anything about the grocery store in there,' and Mr. Galloway said the loan association was not loaning money on the building and that they were loaning the money on the lease and they had to get the four corners in the lease and that that didn't mean anything."

Those present at that time, in addition to Plato and the appellant, were Bailey, Galloway and Lytton Plato. The witness testified that after the group had discussed the lease "we all went up to Mr. Conn's office." Upon direct examination, Mr. Plato left unmentioned what was said and done in the attorney's office, but

upon cross-examination the following was disclosed:

"Q. How many trips did you make to Mr. Conn's office before this lease was signed?

"A. I can't tell you. I don't know accurately. We went up there several times.

\* \* \*

"Q. But, you—if you recall—before that lease was signed, it was discussed in Mr. Conn's office?

"A. It was.

"Q. And Mr. Conn was representing Miss Berry?

"A. Yes."

He also testified:

"Q. You looked over the lease before it was signed, didn't you?

"A. Yes.

"Q. And there was some discussion about the grocery store not being in there?

"A. Yes.

\* \* \*

"Q. You read the lease over enough to know that the grocery store was not in it. Is that right?

"A. Yes.

"Q. And you talked about the grocery store not being in it?

"A. Yes.

\* \* \*

"Q. And knowing the boy (Lytton) had a lease in the store, you were protecting the boy. Why didn't you insist that either that reservation in regard to the grocery store be written into the lease or an agreement between Richfield Oil be entered into with you?

"A. Mr. Welch, if I had done that, we wouldn't be in court today."

As we shall shortly see, the appellant, upon the occasion to which we are referring, handed Mr. Conn the lease and asked him to interpret it for her. Mr. Conn complied with her wishes.

If Galloway told the appellant a few moments before she went to Mr. Conn for advice that, nothwithstanding the fact that the lease covered the entire structure, Richfield would permit her to have the store, we cannot understand why neither the appellant nor Mr. Plato asked the attorney whether the purported oral agreement was valid and enforceable. The record indicates that the appellant knew how to ask apt questions, and that Plato was far from being a man of few words.

Mr. Conn testified that he wrote the letter dated November 7, 1940, which is addressed to Richfield and which is signed by the appellant. A previous paragraph of this opinion quotes from that letter. We deem that fact important because it shows that before the lease was drafted Mr. Conn had become familiar with the impending transaction and the appellant's expectations in regard to it. He testified that the appellant made "quite a lot of visits" to his office. December 30, 1940, the appellant again came to his office; this time she was accompanied by Arthur Plato, Mr. Galloway and Mr. Bailey. She brought with her the unsigned lease. We now quote from Mr. Conn's testimony:

"Q. Were you consulted about the effect of the lease?

"A. Yes, that was the purpose of the call.

"Q. And did you advise Miss Berry about what the lease covered?

"A. I told her it covered the real property therein described.

"Q. At that time was anything said about the store portion of the building?

"A. I think there was no discussion of the store portion of the building at all.

"Q. Was there anything discussed about, well, anything said about an agreement that wasn't in the lease?

"A. No.

"Q. Just the lease itself was brought up to you?

"A. The document.

"Q. Was any other lease mentioned?

"A. No.

"Q. I refer to the lease that is claimed to have been had by Lytton Plato?

"A. No.

"Q. What did Miss Berry want to know?

"A. We went over the lease, and I made some comments on some of the wording. As I recall, I suggested a more apt way to say it, and Galloway said, 'That is the form lease and the company doesn't like to have any changes made in it unless there is some reason for it.' I told the parties it was a very firm lease. I think I specifically used the wording, 'a very tough lease', and it certainly bound them."

The lease was not signed in Mr. Conn's office. The appellant wished to be assured of a loan from the Equitable Savings & Loan Association before she signed the paper. Accordingly, after receiving from Mr. Conn the above advice she went to the Klamath Falls office of Equitable Savings & Loan Association and assured herself that the requested loan would be made to her. She then executed the lease in the office of that concern.

Mr. Conn's testimony was uncontradicted.

Article 22 of the lease provides:

"The parties hereto agree that neither the making, execution nor delivery of this lease has been induced by any representation, statement, warranty or agreement other than those herein expressed, and that all proposals, negoiations and representations with reference to matters covered by this lease are merged in this instrument. The parties understand and agree that regardless of any partial performance or other circumstances, this lease shall not become binding upon Lessee until it has been signed on its behalf by its President, Vice-President or duly authorized agent, and that no amendment or modification hereof shall be valid unless evidenced in writing and signed by one of such officers or agents."

The article just quoted constituted notice to the appellant that (1) Richfield intended the written lease to be the exclusive memorandum of its agreement with her; and (2) Richfield would not recognize any agreement in addition to those set forth in the lease, unless the additional agreement was itself reduced to writing and signed by one of the representatives of Richfield named in the article. The appellant knew that Galloway, who brought the lease to her, was not an officer of the type named in Article 22. For instance, she was asked, and answered, upon that subject as follows:

"Q. At the time that Mr. Galloway visited you down there, did he make any statement at that time as to his authority to close the deal at that time?

"A. He told me he would have to see the company. He would take this in, and when it was OK'd, there would be a lease sent for me.

"Q. And if they didn't OK that, that would be the end of it?

"A. Yes, that was right."

Since the appellant read the lease before she signed it, she encountered the article just quoted; she made no claim to the contrary. She nowhere explained how she thought that the purported oral agreement about the store space could be valid in the face of Article 22, and, of course, did not explain why she did not ask Mr. Conn about the effect of Article 22 upon the alleged oral agreement. As we have seen, she did not even disclose the purported agreement to Mr. Conn when she sought his advice.

The foregoing is a sufficient review of the evidence which bears upon the alleged unwritten agreement to exempt the store space from the signed lease. The testimony given by witnesses whom we have not named is less favorable to the appellant upon that issue than that which we set out. Evidence presented by the respondents indicated that the alleged unwritten agreement was never proposed or made. Respondents' witnesses swore that Galloway made it clear from the outset that the lease would have to cover the entire building, and that he never agreed to any modification of the lease.

From the foregoing it is evident that the appellant read the lease before she signed it. It is likewise evident that she had the benefit of the advice, not only of her friends, but also of a competent attorney. The latter, after familiarizing himself with the lease, told her that it let the entire building and its grounds to the Richfield Oil Corporation. Before the appellant signed the document she did not wish that any word of it be changed, but wanted it to remain exactly as it was. She had good reason for that attitude because the existing phraseology was essential to her purpose to use the lease as security for the loan which she

wished to obtain from the Equitable Savings & Loan Association. In other words, the writing which she signed was exactly as she wanted it to be, and she correctly understood all of its terms. The purported oral agreement upon which she depends is in direct conflict with the words of the document which she signed.

■ Wigmore on Evidence, 3d ed., § 2425, states:

"When the parties negotiate at a distance, by letters and telegrams,—first an offer, then a declination, then a revision of the offer, * * *,—*Where are the terms of the contract to be found?*

"Obviously, in this congeries of letters and telegrams, as mutually modifying and complementing each other. The whole of the contract is not in any one document. * * *

"On the other hand, if instead of leaving the net effect of the negotiations to be gleaned from the mass of writings, a *single document is now finally drawn* up to replace them and to embody their net effect, and is signed or otherwise adopted by the parties, this document will now alone represent the terms of the act. Instead of leaving the wheat mingled with the chaff, the wheat has been definitely selected and set apart in a single mass. The wheat existed there, no less before than now, but it has now been placed in a single receptacle by itself.

"This process of embodying the terms of a jural act in a single memorial may be termed the *Integration* of the act, i.e. its formation from scattered parts into an integral documentary unity. The practical consequence of this is that its scattered parts, in their former and inchoate shape, do not have any jural effect; they are replaced by a single embodiment of the act.

"In other words: *When a jural act is embodied in a single memorial, all other utterances of the*

*parties on that topic are legally immaterial for the purpose of determining what are the terms of their act.*

"This principle is perfectly well settled in our law."

See to the same effect Restatement of the Law, Contracts, § 237.

■ We quote the following from Williston on Contracts, Rev. Ed., § 639:

"The general rule is clear that a parol agreement which is in terms contradictory to the express words of a contemporaneous or subsequent written contract, properly interpreted, necessarily is ineffectual and evidence of it inadmissible whether the parol agreement be called collateral or not. * * * "

The principle of law to which we have adverted assumes statutory form in Oregon through the medium of § 2-214, O. C. L. A., which says:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and the representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases:

"(1) * * *

"(2) Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of * * *, or to establish illegality or fraud. * * * "

The appellant seeks to avoid that rule by pleading fraud in execution. She claims that Richfield, for the purpose of inducing her to sign the lease which let the entire premises to it, promised that it would permit her to have the store. She contends that Richfield never intended to fulfill the promise and made it for fraudulent purposes.

■ We are convinced that the evidence upon which the appellant depends was not admissible and that it is incapable of nullifying the provisions of the lease in regard to the store space. We add that virtually all of the evidence concerning the store was received without objection. When the appellant signed the challenged document she intended to enter into jural relationships with the respondent, Richfield. When she took her pen in hand she knew that she and Richfield were making a memorial or integration of their agreement, so that if a dispute presented itself in the years ahead it could be settled by recourse to the paper she was about to sign. She understood what she was doing and knew that the paper in her hand, when given its normal legal effect, let the entire structure to Richfield for a term of ten years. She was laboring under no misapprehension whatever concerning the meaning of the paper; in fact, she wanted the instrument phrased exactly as it was so that Equitable Savings & Loan Association would see that it granted to Richfield a lease upon the entire property, store and station. When a person pursues the course that the appellant took, a court, in determining the legal effect of the course, is required to hold that the person bound himself by the instrument to which he assented, unless his signature was induced by fraud or some other unlawful medium. Fraud which vitiates a contract is of two kinds: fraud in the inducement and fraud in the execution. The appellant claims no fraud in the inducement, but urges that she proved fraud in the execution. She, however, was not tricked or deceived into executing something different from what she intended. She signed the very document she wished to sign and knew that Richfield construed it in identically

the same way as she. The purpose of signing an instrument is to assure courts, in the event of subsequent litigation, that the party assented to the contents of the document. The appellant signed the lease in order to manifest her assent. We are convinced that the evidence upon which she depends was inadmissible, and that having been admitted does not suffice to nullify the lease.

Although the above warrants an affirmance of the attacked decree, there are additional reasons which support this conclusion. The paper which the appellant signed told her that Galloway, upon whom she now says she relied, had no power to alter the terms of the instrument. It also told her that Richfield would not recognize any contemporaneous agreement unless it was reduced to writing and was signed by an authorized Richfield representative. Provisions of that kind have frequently received the assent of courts. See Wigmore on Evidence, 3d ed., § 2434a, and Williston on Contracts, Rev. Ed., § 759. Since the purported collateral agreement is not evidenced in the manner demanded by the lease itself, evidence concerning it was inadmissible.

Finally, we believe that even if the evidence could be deemed admissible, it would not sustain the charge of fraud. In the period of more than five years that passed after the instrument became effective, the parties had several misunderstandings resulting in conferences between the appellant, her attorney and representatives of Richfield. The uncontradicted evidence indicates that at no time did the appellant intimate any claim of fraud, deceit or misrepresentation. We also think that the evidence warrants a conclusion that in those conferences she never claimed

that she was entitled to the store as a matter of right. If, in those five years, she ever breathed a word about the purported unwritten agreement, she made scant mention of the fact while testifying. As we have said, the appellant, while upon the witness stand, attributed no untruthful statements to Bailey. Her witness, Lytton Plato, while testifying concerning the conference which occurred after Galloway had presented to the appellant the unsigned lease for her scrutiny, was asked by appellant's counsel whether or not Bailey at that time said anything concerning the lease. His reply was, "It don't seem to me he had anything to say about it." Thus there is not a word in the record which shows that Bailey uttered even one false syllable. Another circumstance: When the building was completed the appellant was unable to pay for it. That was due to the fact that she had no cash, and Equitable refused to make the loan for which she had applied until she corrected an erroneous description of her property. When ruin threatened and the appellant needed a friend, Bailey proved to be a friend indeed. He signed notes at a local bank aggregating $5,600 with which the contractor's demands were satisfied. The building had cost more than the preliminary estimate. Bailey stepped into the breach without any security whatever, and even after Equitable advanced the loan money ($4,200) he continued to remain the appellant's benefactor until she eventually repaid him the difference between $5,600 and $4,200. The appellant's act in making reckless charges of fraud against a man who befriended her in an hour of impending financial disaster does not commend her to a court of conscience. We add that Bailey received no compensation whatever for his generous act.

We have no hesitancy in affirming the attacked decree.

SUBMITTED ON APPELLANT'S OBJECTIONS TO RESPONDENTS' COST BILL.

*Forrest E. Cooper,* of Lakeview, for the objections.

*Herbert P. Welch,* of Lakeview, contra.

Before LUSK, Chief Justice, and BELT*, ROSSMAN, BAILEY and LATOURETTE, Justices.

Objections sustained as to first item, overruled as to second.

ROSSMAN, J.

The cost bill is before us upon objections filed by the appellant "to the claim for reimbursement for all pages in excess of seventy-three pages of respondents' brief." The objections seek to eliminate as a taxable item twenty-two pages of the brief. The contested pages consist of a printing of (1) some items of unadmitted evidence which were neither presented during the trial nor received, and (2) the memorandum opinion filed by the trial judge.

■ The unadmitted evidence consisted of copies of purported correspondence. The latter was printed as an appendix in the respondents' brief in an apparent effort to avoid a charge made by the appellant that the respondents had concealed some material evidence, that is, this correspondence. The correspondence was not mentioned expressly at the trial. Although the respondents' motive in printing the material is understandable, the fact remains that the printed material was no part of the record. It was inappropriate for our consideration, and was not considered by us. When the

---

\* Died August 6, 1950.

respondents' brief was filed, a motion by the appellant to strike from it these pages would have been proper. The respondents are not entitled to tax as costs anything for printing this correspondence.

The trial judge's memorandum opinion was filed in the Circuit Court record of this case and thus became a part of the material which was sent to this court. Being a part of the record, it was available to us. When printed in a brief, a memorandum opinion achieves multiple form and is readily available to all members of the court.

■ The memorandum opinion was cited twice in the brief of the respondents, besides being printed therein. Each citation was upon a material matter. Moreover, the issues which were stated and resolved in the memorandum opinion did not include a charge which the appellant stresses upon appeal, thereby indicating that the unmentioned matter was, possibly, an afterthought. We cannot say that the printing of the memorandum opinion was a needless expense; to the contrary, we hold that it was justifiable. The memorandum opinion was printed as an appendix to the respondents' brief in the manner permitted by Rule 9, § 2, of the Rules of Procedure of this court (see Rules of Procedure of the Supreme Court as amended December 29, 1949, and effective March 1, 1950). The rule just mentioned was not effective when the brief was filed, but, nevertheless, is persuasive upon the issue before us.

The objections are sustained as to the first item and overruled as to the second.